**John Rooney, Individually and as Administrator of the Estate of Margaret Orr Rooney v. Medical Center Hospital of Vermont, Inc., Anesthesia Associates of Burlington, Inc., and E.A. Kristensen, M.D.**

[649 A.2d 756]

No. 93-322

Present: Gibson, Dooley, Morse and Johnson, JJ., and Peck, J. (Ret.), Specially Assigned

Opinion Filed July 22, 1994

Motion for Reargument Denied September 6, 1994

*Alan F. Sylvester, Geoffrey M. FitzGerald* and *Margaret A. Mangan* of *Sylvester & Maley, Inc.*, Burlington, for Plaintiff-Appellant.

*Ritchie E. Berger* and *Philip C. Woodward* of *Dinse, Erdmann & Clapp*, Burlington, for Defendant-Appellee Medical Center Hospital.

*Robert D. Rachlin, Gary H. Barnes* and *Coddy Marx* of *Downs Rachlin & Martin*, Burlington, for Defendants-Appellees Anesthesia Associates and Kristensen.

**Morse, J.** In this medical malpractice action, plaintiff John Rooney brought suit against defendants Dr. E.A. Kristensen, Anesthesia Associates, and the Medical Center Hospital of Vermont, Inc. (MCHV) for the wrongful death of his wife, Margaret Rooney, who was survived by plaintiff and their two children, then aged 16 months and 5 days. Plaintiff claimed that defendants were negligent in the care provided to his wife, resulting in her death. The jury returned a defendants' verdict. On appeal, plaintiff's primary assertion is that the court's instruction on the standard of care improperly informed the jury in effect that the defendant anesthesiologist was not liable if she did her best under the circumstances. We agree that the standard of care instruction with regard to the performance of Dr. Kristensen was error, requiring reversal and a remand for a new trial as to her and her employer, Anesthesia Associates. We affirm as to defendant MCHV.

On January 11, 1988, Mrs. Rooney was admitted to MCHV for an emergency cesarean section. Dr. Kristensen was the attending obstetrical anesthesiologist for the surgery. After a spinal anesthetic failed to relieve Mrs. Rooney's pain, Dr. Kristensen administered general anesthesia, which contained a paralytic agent that prevented Mrs. Rooney from breathing on her own. Dr. Kristensen was also responsible for delivering oxygen to Mrs. Rooney during the operation. The normal procedure for doing so, called intubation, is accomplished by introducing oxygen under pressure into the patient's lungs by a tube through the patient's mouth.

After administration of the general anesthesia, Mrs. Rooney was unable to be intubated. Apparently, she had suffered a rare allergic reaction to one of the anesthetic agents, which caused her tongue and upper airway to swell. As Mrs. Rooney's oxygen saturation and pulse fell to life-threatening levels, Dr. Kristensen and Dr. Brackett, a resident physician, continued to attempt intubation. They also tried, unsuccessfully, to ventilate Mrs. Rooney by forcing air down her windpipe into her lungs using a bag and mask.

A short time after the breathing emergency began, Dr. Kristensen directed the obstetricians on hand to remove the baby in order to save the baby's life and to facilitate resuscitation. The delivery took about one minute, and Dr. Kristensen instructed an attending nurse to page for surgical help and a tracheostomy tray immediately after the baby was born.

Dr. Kristensen rejected performing a surgical cricothyrotomy—use of a scalpel to cut a passage through the neck to permit placement of a tube into the trachea—because she did not feel comfortable doing it after not having performed surgery for twelve years. Instead, Dr. Kristensen used a medical "Nu-Trake" device in an attempt to obtain an airway. Use of the device, which is designed for emergency use to create an airway by placing a dilator through the trachea, was also unsuccessful. The procedure produced profusive bleeding, later determined to have been caused by an anatomical anomaly of Mrs. Rooney's carotid artery, which crossed over the front of her trachea instead of down the side of it.

Dr. Kristensen then attempted to obtain an airway by using a pressurized needle and catheter device called a transtracheal jet ventilator (TTJV). This procedure proved futile because, as explained by defendants' expert witnesses, Dr. Jonathan Benumof and Dr. David Chestnut, the Nu-Trake device had created a larger hole in the tissue than necessary for the TTJV, allowing oxygen to enter surrounding tissue and swell Mrs. Rooney's neck.

When the surgeons arrived, they successfully performed a tracheostomy. This procedure requires an incision through the trachea lower down on the neck than the surgical cricothyrotomy and is more complicated than the cricothyrotomy. Oxygen was then introduced to Mrs. Rooney; however, by that time, Mrs. Rooney had suffered permanent and irreversible brain damage. She died five days later.

At trial, plaintiff advanced several factual theories of liability against Dr. Kristensen. Plaintiff asserted that Dr. Kristensen had not formulated an adequate plan to deal with the "can't intubate/can't ventilate" emergency. Plaintiff also maintained that Dr. Kristensen should have paged surgeons sooner and not hesitated to use other alternatives once initial efforts to intubate and ventilate had failed. Additionally, plaintiff alleged that Dr. Kristensen should have had the skill and knowledge to perform a surgical cricothyrotomy or else performed a transtracheal jet ventilation instead of attempting the Nu-Trake device. As argued by plaintiff, the Nu-Trake device was not an appropriate option under the circumstances, and because Dr.

Kristensen had improperly used the Nu-Trake device, the subsequent TTJV attempt was ineffective. Plaintiff's action against Anesthesia Associates was based upon vicarious liability as the employer of Dr. Kristensen.

In defense, Dr. Kristensen argued that an extremely rare allergic reaction to the general anesthesia, in conjunction with Mrs. Rooney's aberrant carotid artery, caused the tragedy. She maintained that her plan was appropriate and that she did everything she reasonably could, moving from one step to the next, i.e., intubation, mask ventilation, calling for surgeons, trying the Nu-Trake device, and further attempts at ventilation. She claimed that the Nu-Trake device was a reasonable choice in early 1988, and that she properly used it. Finally, she argued that had she attempted the surgical crico-thyrotomy, she unavoidably would have severed Mrs. Rooney's aberrant carotid artery, causing her to bleed to death.

Plaintiff's theory of liability against MCHV was based upon the alleged unreasonable delay in getting surgeons to the operating room and in making a tracheostomy tray available. MCHV's defense was that hospital personnel responded adequately to the crisis and that a tracheostomy tray was readily produced and duplicate instruments were already in the operating room. At trial, the focus of the evidence and fault issues centered largely on the actions of Dr. Kristensen.

Plaintiff argues on appeal that in addition to error in the trial court's standard-of-care jury instruction, there was error in the court's proximate cause instructions and in its instructions to the jury on deposition testimony.

## I.

At the outset, we address a point raised by the hospital concerning plaintiff's requisite showing on appeal. Defendant MCHV claims that plaintiff must show prejudicial error with respect to both the standard of care and proximate cause instructions to prevail on appeal. Plaintiff had requested a general verdict, while the hospital had requested that the jury decide separately, and indicate in writing, the elements of the breach of care and proximate cause. Defendants Dr. Kristensen and Anesthesia Associates did not request a form of the verdict one way or the other. The trial court submitted a general verdict form to the jury, which simply stated: "We the jury _____ do _____ do not find [specific party] to have been negligent, which negligence proximately caused the death of Margaret Rooney."

MCHV argues that the jury may have returned a verdict favorable to it on either the standard of care or proximate cause elements of

medical malpractice. MCHV points out that because plaintiff requested a general verdict, this Court is now unable to determine the precise reasons the jury returned a defendants' verdict. Relying on *Contractor's Crane Service, Inc. v. Vermont Whey Abatement Authority*, 147 Vt. 441, 446, 519 A.2d 1166, 1171 (1986) (in civil case involving multiple independent theories of liability, general verdict in favor of plaintiff may not be reversed unless prejudicial error is shown in all theories of recovery), MCHV urges us to apply an analogous rule to this case and affirm the general verdict unless plaintiff demonstrates reversible error on both elements of the negligence charge.

We do not reach MCHV's argument because, as addressed later in this opinion, we find no error with respect to either the standard of care or proximate cause elements pertaining to MCHV. We note that defendants Dr. Kristensen and Anesthesia Associates did not raise this issue on appeal, and, indeed, they did not preserve this issue below.

## II.

The challenged standard-of-care instruction applicable to Dr. Kristensen stated in full:

Now, I'll [talk] for a minute about the law governing the claim against Dr. Kristensen. Plaintiff must prove the degree of knowledge or skill possessed or care ordinarily exercised by a reasonably skillful, careful and prudent anesthesiologist engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont.

He must next prove that Dr. Kristensen either lacked this degree of knowledge or skill, or failed to exercise this degree of care.

And, finally, that as a proximate result of this lack of knowledge or skill or care, Margaret Rooney suffered injuries that would not otherwise have occurred.

By undertaking to perform a medical service, *a physician does not, nor does the law require her to, guarantee a good result.* The physician is liable only for negligence, failure to bring to bear the level of knowledge or skill or care I just described.

The law recognizes that there are differences in the abilities of doctors, just as there are in the abilities of people engaged in

other activities. To practice the profession of medicine, a physician is not required to be possessed of the extraordinary knowledge and ability that belongs to the few practitioners of rare endowments. But the physician is required to keep abreast of new techniques and knowledge and to practice in accordance with the approved methods and means of treatment in general use in the field of anesthesiology.

In performing a medical service, a physician is obligated to use her *best judgment and to use reasonable care in the exercise of her knowledge and ability.* The rule requiring use of *her best judgment* does not make her liable for a *mere error of judgment,* provided she exercises *reasonable judgment in bringing to bear the level of knowledge, skill and care previously described.* The rule of reasonable care does not require the exercise of the highest possible degree of care, it requires only that she exercise that degree of care that a reasonably prudent anesthesiologist would exercise under the same circumstances.

Negligence is not shown simply because *in hindsight* some other course of action would have been better or more effective.

(emphasis added). The underlined portions are the principal focus of plaintiff's claims of error.

■ The critical issue is whether these instructions, read "as a whole," meet our oft-stated standard of review by ""'"breath[ing] the true spirit and doctrine of the law.""" *Turgeon v. Schneider,* 150 Vt. 268, 276, 553 A.2d 548, 553 (1988) (quoting *Choiniere v. Sulikowski,* 126 Vt. 274, 277, 229 A.2d 305, 307 (1967) (quoting *In re Moxley's Will,* 103 Vt. 100, 114, 152 A. 713, 718 (1930))). We conclude that the standard-of-care instruction under review did not.

### A.

The standard of care applicable in this case is set out by statute:

In a malpractice action . . . , the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care *ordinarily exercised by a reasonably skillful, careful, and prudent health care professional* engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont.

12 V.S.A. § 1908(1) (emphasis added).

■  Plaintiff attacks the "best judgment" and "error in judgment" language used by the trial court here as inconsistent with this statutorily imposed objective standard. The first sentence of the instruction specifically under attack asserts that Dr. Kristensen should have used "her best judgment" and reasonable care in the exercise of "her knowledge and ability." A plain reading of this sentence, in light of the standard of care expressed in § 1908(1), leads to the conclusion that even if Dr. Kristensen's "knowledge and ability" did not measure up to the required degree, she is not liable as long as she did her best and was reasonably careful under the circumstances. In other words, the instruction would improperly permit a jury to conclude that a physician who lacked the requisite skill or knowledge is not liable as long as she used her best judgment and reasonable care in the exercise of whatever skill or knowledge she did possess, however limited.

■■  That is not the law. Section 1908(1) imposes an *objective* standard, and measures the defendant doctor's conduct against what a reasonable doctor would have done in the same or similar circumstances. The trial court's error in suggesting a subjective standard was compounded by the reiteration of the "best judgment" language in the following sentence, which refers to the "level of knowledge, skill and care *previously described.*"

■  The challenged words are not cured by the context in which they appear. While the beginning and end of the standard-of-care instruction correctly state the law, the error was not harmless. See *Feldman v. Lederle Lab.*, 625 A.2d 1066, 1069 (N.J. 1993) (inconsistent statements in jury charge do not counteract one another to produce correct jury instruction). In fact, Dr. Kristensen's final argument centered largely on the theme that she did her best "under fire." For instance, acknowledging that not all patients survive, counsel expounded: "But, that's life. You [the doctor] do your best, you try your hardest."

The "mere error in judgment" reference further compounded the confusion in that the term is subject to varying definitions. Does it mean a sound judgment, which "merely" led to a bad result, that is, the alternatives considered were proper but the one chosen "merely" happened to lead to trouble through no fault of the doctor? Or does it mean that the judgment itself was flawed, regardless of the result?

Defendants maintain the language was necessary to "tell the jury that a mistaken judgment, without more, does not establish malprac-

tice." See *Watson v. Hockett*, 727 P.2d 669, 674 (Wash. 1986) (en banc) ("error in judgment" instruction appropriate when doctor has choice among competing therapeutic techniques or medical diagnoses). While we have upheld instructions that tend to explain what the standard of care is not, see *Utzler v. Medical Ctr. Hosp. of Vt.*, 149 Vt. 126, 127, 540 A.2d 652, 653 (1987) (physician not required to be infallible), the "mere error in judgment" instruction begs for a meaning. The message intended by the giving of the instruction—that a doctor may choose among several proper alternatives, even though the one chosen leads to an unfortunate result—is not self-evident. The instruction would have been more understandable if it had spelled out that when a doctor chooses between appropriate alternative medical procedures or actions, harm that results from the doctor's choice of one alternative over the other is not necessarily malpractice. Appropriate choices could be defined as those that a reasonable doctor would have considered under the same or similar circumstances. In this case, a surgical cricothyrotomy, the Nu-Trake device, and the jet ventilator all arguably afforded appropriate alternatives when the "can't intubate/can't ventilate" emergency developed. Despite plaintiff's claim that Dr. Kristensen did not use the Nu-Trake device properly, the "mere error of judgment" language may even have misled the jury to think that the selection of an appropriate course of treatment absolves a doctor from liability, regardless of the administration of that treatment.

As we stated in *Deyo v. Kinley*: "It may in fact be better to avoid error in judgment language because such language is basically ambiguous and subjective." 152 Vt. 196, 208–09, 565 A.2d 1286, 1293 (1989); see also *Rogers v. Meridian Park Hosp.*, 772 P.2d 929, 933 (Or. 1989) (en banc) ("error in judgment" instruction "obscures the fact that, to avoid liability, the defendant must exercise the degree of care, skill, and diligence required by law," and "suggest[s] that substandard conduct is permissible if it is garbed as an 'exercise of judgment'"). A number of courts have directed similar criticism at malpractice instructions revolving around "judgment." See, e.g., *Somer v. Johnson*, 704 F.2d 1473, 1478 (11th Cir. 1983) ("honest error of judgment" instruction "invited the jury to make impermissible alternative findings that the defendants had violated the appropriate standard but conformed to the incorrect one"); *Sleavin v. Greenwich Gynecology & Obstetrics, P.C.*, 505 A.2d 436, 440 (Conn. App. Ct. 1986) ("bona fide error in judgment" charge likely to confuse jury); *Teh Len Chu v. Fairfax Emergency Medical Assocs.*, 290 S.E.2d 820, 822 (Va. 1982)

(per curiam) (terms like "bona fide error" and "honest mistake" are improper in instructions concerning negligence in medical malpractice actions).

■ Since the challenged paragraph was given only in reference to Dr. Kristensen and Anesthesia Associates, the error does not affect the verdict for the hospital.

## B.

Other portions of the standard-of-care instruction are also challenged. With respect to Dr. Kristensen and Anesthesia Associates, the court told the jury that "[n]egligence is not shown simply because in hindsight some other course of action would have been better or more effective." Plaintiff argues that this language precluded the jury from drawing a permissible inference of negligence from Dr. Kristensen's use of the Nu-Trake device on the ground that a reasonable practitioner would have chosen a more effective alternative, such as the TTJV or surgical cricothyrotomy. We find no error.

■ Any course of conduct, regardless of its efficacy or the availability of other options, which is in accordance with the applicable standard of care is not negligence. See *Holbrook v. Fokes*, 393 S.E.2d 718, 719 (Ga. Ct. App. 1990) ("after-the-fact" assessment of evidence does not support negligence if "initial assessment" met the standards of reasonable medical care). The "hindsight" instruction given here informed the jury properly that it should not be influenced by evidence developed in the years following Mrs. Rooney's death that made the transtracheal jet ventilator a better choice than the Nu-Trake device. Dr. Kristensen's decision to use the Nu-Trake device must be measured against the standard of care applicable in 1988, not at the time of trial. The instruction made that point.

■ Plaintiff also objected to, and appeals, that portion of the instruction stating that a doctor does not "guarantee a good result," and that part applicable to MCHV stating "[a] hospital, too, does not guarantee a good result. It is liable only for negligence." We have previously indicated that "no guarantee" instructions, if given, must be phrased in a straightforward and nonargumentative manner. *Deyo v. Kinley*, 152 Vt. at 208, 565 A.2d at 1293. The instructions given here do not deviate from this standard. Moreover, despite the court's instruction that the jury not be swayed by sympathy for plaintiff, this case was particularly sympathetic to plaintiff's point of view. In this

context, the "no guarantee" instruction would help to dispel a jury's urge to call for relief solely because the result was so tragic.

## III.

Plaintiff next argues, applicable to all defendants, that the court erred in failing to give a concurrent cause instruction, and further claims that the three-pronged proximate cause instruction was erroneous or at best confusing. Plaintiff requested the trial court to instruct the jury that:

[I]t is not necessary for the plaintiff to establish that the negligence was the sole cause of the death. In other words, there may be more than one proximate cause concurring to produce an injury or death. And, wherever there is more than one proximate cause of an injury or death, the injury or death may be attributed to any and all of such causes and, under Vermont law, recovery may be had from a defendant who is responsible for any one of the several causes.

. . . .

You should also have in mind that if the negligence of one or more of the defendants brings into activity a condition to which Margaret Rooney was predisposed, proximate cause exists between the defendants' negligence and the entire damages which ensue.

The instruction given stated in relevant part:

To prove that any negligence was a proximate cause of death, three things must be shown. One, the negligence led to the death in a natural and uninterrupted sequence of events. Two, the negligence was a substantial factor in bringing about the death. And, three, the death would not have happened if that defendant had not been negligent.

In some cases *an occurrence may have more than one proximate cause*. In order to render a verdict against any defendant, you must first find that party to have been negligent and then that the negligence must have been a proximate cause, or was a proximate cause, of Margaret Rooney's death.

(emphasis added) (citations omitted).

Although plaintiff did submit his own proximate cause instruction, he never objected to the trial court's three-prong proximate

cause instruction. Therefore, the issue was not preserved and we do not reach it. V.R.C.P. 51(b) (party may not assign error to court's failure to give requested instruction unless party objects thereto, stating grounds for objection distinctly). The crux of plaintiff's challenge is that the trial court failed to emphasize to the jury that defendant's negligence need not be the only cause of the injury complained of and defendants could be found liable if their negligence was a substantial factor, concurring with some other cause acting at the same time, in bringing about the damage. The instruction given, however, made it plain—albeit in more succinct terms than offered by plaintiff—that more than one proximate cause of Mrs. Rooney's death was possible and if a defendant's negligence was one of them, liability would follow. Although this charge did not use the words "concurrent cause," it did use the indefinite article "a," and more importantly, it specifically told the jury that there could be more than one proximate cause. See *Mobbs v. Central Vt. Ry.*, 155 Vt. 210, 219, 583 A.2d 566, 577 (1990) (use of indefinite article "a" rather than definite article "the" indicated that more than one proximate cause was possible).

Brevity of an instruction, without more, is hardly grounds for complaint. If plaintiff wanted to elaborate on the meaning of the instruction, he could have done so in his final argument to the jury. That the verdict form required the jury to find that a defendant's negligence *proximately caused* Mrs. Rooney's death has to be read in light of the entire instruction. Contrary to plaintiff's argument that the jury was misled, we conclude the instruction was proper.

## IV.

Last, plaintiff argues that the trial court made two errors with respect to deposition testimony introduced at trial. First, he claims that Dr. Kristensen, her expert witnesses, and the head nurse of MCHV all "changed their deposition testimonies on important particulars without any prior notice to plaintiff" in violation of V.R.C.P. 26(e). Second, plaintiff maintains that the court should have instructed the jury, as he had requested, that prior deposition testimony could be considered as substantive evidence.

## A.

At trial, based upon several witnesses' differences between deposition testimony and in-court testimony, plaintiff sought to impeach them and to emphasize the substantive importance of their deposition

testimony. Plaintiff asked the witnesses about a party's responsibility to supplement and correct deposition testimony. Dr. Kristensen objected to the line of inquiry, maintaining that there was no continuing duty to supplement or correct deposition testimony. In sustaining the objection, the court cautioned the jury:

> [I]f there are some changes in opinion or recollection, there is no ongoing obligation on the part of the witness to communicate those changes.

Rule 26(e), governing supplementation of discovery responses, begins by stating:

> A party who has responded to a request for discovery with a response that was complete when made is under *no* duty to supplement the response to include information thereafter acquired . . . .

(emphasis added). This rule is, however, subject to certain exceptions. One exception requires a party "to supplement [a] response with respect to any question directly addressed to . . . the substance of [expert witness] testimony." V.R.C.P. 26(e)(1) (B). Another exception imposes a duty to supplement when "the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." V.R.C.P. 26(e)(2)(B). The Rule 26(e) exceptions impose a burden to supplement discovery only "where after-acquired information is of great importance and is particularly likely to come to the attorney's attention." Reporter's Notes, V.R.C.P. 26.

The differences between witnesses' deposition testimony and trial testimony in this case were not surprising. For instance, Dr. Kristensen testified at her deposition that it took 15–20 minutes for a tracheostomy tray to arrive after her initial request, but testified at trial that it took only 10–15 minutes for it to arrive. MCHV head nurse Bridgette Verdon testified at her deposition that at some point prior to January 11, 1988, tracheostomy trays were available outside of every operating room at the hospital, but at trial was unable to recollect any such practice at the hospital prior to that date. Dr. Kristensen's expert witness, Dr. Chestnut, testified at his deposition that he was unable to say why Dr. Kristensen was unable to intubate or ventilate Mrs. Rooney, or whether the aberrant carotid artery caused Dr. Kristensen to encounter blood when she used the Nu-Trake device. At trial, Dr. Chestnut testified that the likely reason for

Mrs. Rooney's obstructed airway was an allergic reaction to one of the drugs administered and that the Nu-Trake device probably lacerated the carotid artery.

■ Shifting recollections of events which transpired five years previously are understandable, as is the fact that experts may interpret events in a different light over time. While we may reasonably differ on the relative importance of the shifting accounts of various testimony, the differences did not change any expert's more significant opinions or reveal any knowing concealments. The differences in the recounting of the facts was not so marked that the court's ruling on the duty to supplement deposition transcripts was an abuse of discretion.

## B.

V.R.E. 801(d)(1)(A) permits prior inconsistent statements made in depositions to be used as substantive evidence. See Reporter's Notes, V.R.E. 801. Although plaintiff did not object at trial, he now complains that the trial court failed to instruct the jury that the deposition testimony could be considered both as impeachment and substantive evidence. The court instructed the jury as follows:

> If you conclude there has been a change in recollection, opinion or testimony of any witness from the time of the deposition to the time of trial, [] you will consider what the change is, consider its significance and consider how you weigh it as part of weighing the testimony of the witness.

In its final charge to the jury, the court instructed:

> If you believe that any witness has been [] impeached, then it is your exclusive province to give the testimony of that witness just such credibility or weight as you may think it deserves.

Neither instruction limited the use of the prior inconsistent statement for any particular purpose. The jury was free to "weigh" the evidence for any purpose it saw fit. No error occurred.

*Reversed and remanded for a new trial against defendants Dr. E.A. Kristensen and Anesthesia Associates. Affirmed as to defendant Medical Center Hospital of Vermont.*