295 N.J. Super. 113 (1996)
684 A.2d 944
ANGELA MORLINO, PLAINTIFF-APPELLANT,
v.
MEDICAL CENTER OF OCEAN COUNTY, J. DUGENIO, M.D., AND FLAVIUS THOMPSON, M.D., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1996..
Decided November 15, 1996.
*115 Before Judges HAVEY, BROCHIN and EICHEN.
Robert B. Kurzweil argued the cause for appellant (Katz, Ettin, Levine, Kurzweil & Weber, attorneys; Mr. Kurzweil, on the brief).
Joseph A. DiCroce argued the cause for respondent Medical Center of Ocean County (DiCroce & Maggs, attorneys; Mr. DiCroce, on the brief).
*116 Martin J. McGreevy argued the cause for respondent J. Dugenio, M.D. (Carton, Witt, Arvanitis & Bariscillo, attorneys; Mr. McGreevy, of counsel; Russell J. Malta, on the brief).
John R. Orlovsky argued the cause for respondent Flavius Thompson, M.D. (Orlovsky, Moody, Schaaff & Gabrysiak, attorneys; Mr. Orlovsky and Paul F. Schaaff, Jr., on the brief).
The opinion of the court was delivered by HAVEY, P.J.A.D.
In this medical malpractice case, defendant Jose Dugenio, M.D., prescribed Ciprofloxacin, an antibiotic, to plaintiff who was eight months pregnant. Plaintiff's fetus died one day after plaintiff ingested the drug. She sued defendant Dugenio, Flavius Thompson, M.D., her obstetrician, and the Medical Center of Ocean County, seeking damages for severe emotional distress as a result of the death of the fetus. A jury returned a unanimous verdict in favor of defendants.
On appeal, plaintiff argues that the trial judge erred by: (1) refusing to instruct the jury that it could consider a violation by Dr. Dugenio of warnings included in the Physicians' Desk Reference (PDR)[1] as evidence of Dr. Dugenio's negligence; (2) giving the "exercise of judgment" instruction to the jury; and (3) refusing to instruct the jury that the testimony of a single witness may be sufficient to convince the jury of an essential element of plaintiff's claim. We affirm.
*117 Plaintiff's due date was April 6, 1990. Her pregnancy was free of complications other than a minor urinary tract infection, upper respiratory infection and vaginitis. On March 20, 1990, plaintiff went to the emergency room of Ocean County Medical Center in Point Pleasant, seeking treatment for a sore throat. Dr. Dugenio, an emergency room physician, took a history from plaintiff. He noted that she was eight months pregnant and had visited the emergency room approximately two weeks earlier on March 5, 1990, complaining of a sore throat, congestion and swollen glands. According to hospital records, on plaintiff's March 5, 1990 visit, she was diagnosed as suffering from acute pharyngitis (sore throat), and was given a prescription for amoxicillin, an antibiotic.
Dr. Dugenio examined plaintiff and ordered blood tests and a throat culture. After examining the blood work and noting the resurgence of plaintiff's previous symptoms, Dr. Dugenio suspected a bacteria known as hemophilus influenzae as the primary cause of plaintiff's condition. He was concerned with the possibility of serious complications. Consequently, Dr. Dugenio administered a 500 milligram pill of Ciprofloxacin to plaintiff. Dr. Dugenio selected Ciprofloxacin because he feared that the hemophilus influenzae bacteria could lead to other illnesses which may pose a serious threat to both plaintiff and the fetus.
The next day, on March 21, 1990, plaintiff was examined by her obstetrician, Dr. Thompson. During the examination, a sonogram revealed fetal demise.
Dr. Steven Clark, plaintiff's expert in obstetrics and maternal/fetal medicine, testified that plaintiff had a severe reaction, known as anaphylaxis, to the Ciprofloxacin, causing low blood pressure and low oxygen intake. As a result, the fetus was deprived of oxygen and blood flow, ultimately causing its demise. It was his view that Dr. Dugenio deviated from the accepted standard of care when he administered Ciprofloxacin for a sore throat to a pregnant patient.
During his testimony, Dr. Clark referred to the following warnings about the use of Ciprofloxacin contained in the PDR:

*118 CIPROFLOXACIN SHOULD NOT BE USED IN CHILDREN OR PREGNANT WOMEN. The oral administration of ciprofloxacin caused lameness in immature dogs. Histopathological examination of the weight-bearing joints of these dogs revealed permanent lesions of the cartilage.
The PDR also placed Ciprofloxacin in "Use-In-Pregnancy Category C," which means:
Risk cannot be ruled out. Human studies are lacking, and animal studies are either positive for fetal risk, or lacking as well. However, potential benefits may justify the potential risk.
Dr. Clark stated that a reasonable and prudent practicing physician does not use Ciprofloxacin for pregnant patients unless they are critically ill and they fail to respond to all other antibiotics. He testified that there were a number of effective alternatives which were safer than Ciprofloxacin, and that the risks of administering Ciprofloxacin "absolutely" outweighed the benefits. Dr. Clark did acknowledge that the arthropathy (joint cartilage damage) warned of in the PDR is not what occurred to plaintiff's fetus; rather, the fetus expired because of an anaphylactic reaction suffered by the plaintiff. He also admitted that it was rare for a patient to have a reaction to Ciprofloxacin, and that it was just as likely that plaintiff could have had the same type of reaction to any other antibiotic.
Plaintiff also presented testimony by Dr. Chester Smialowicz, an infectious disease specialist. Dr. Smialowicz, like Dr. Clark, noted that the PDR instructs that Ciprofloxacin should not be given during pregnancy unless the mother's life is threatened and no safer antibiotic will help. He also stated that it was a deviation from the accepted standard of care to have given a pregnant patient Ciprofloxacin for acute pharyngitis. He added that acute pharyngitis is not caused by hemophilus influenzae, and therefore plaintiff did not even require an antibiotic. He knew of no reason why Dr. Dugenio, even if he believed the cause of plaintiff's pharyngitis to be bacterial, could not have attempted to treat plaintiff with a penicillin, a cephalosporin, or an erythromycin. Dr. Smialowicz declared that no competent physician would expect that the organisms causing plaintiff's pharyngitis would enter her *119 blood stream or cross over into her fetus and threaten the fetus' life.
The defense presented Dr. Sidney Wilchins, who testified that the administration of Ciprofloxacin was proper because of the ineffectiveness of the amoxicillin. He added that the risks of not treating a pregnant patient in the presence of hemophilus influenzae were "infinitely catastrophic" to a developing fetus as compared with the risks of treating the mother with Ciprofloxacin. It was also his opinion that Ciprofloxacin played no role in the death of plaintiff's fetus; the death was more likely caused by the length of plaintiff's umbilical cord.
Also testifying for the defense was Dr. Julius Kaplan. Dr. Kaplan agreed with Dr. Wilchins that under the specific circumstances of this case, it was appropriate for a physician to use his medical judgment and prescribe a stronger antibiotic after the first, (amoxicillin), was unsuccessful, because the other drugs available to the plaintiff were not effective against the bacteria causing plaintiff's infection.

I
Plaintiff requested the trial judge to read verbatim, as part of the jury instruction, the two recitals in the PDR containing the warnings that Ciprofloxacin should not be used by children or pregnant women, and that the risk to the human fetus from Ciprofloxacin could not be ruled out. She further requested that the jury be instructed that, if Dr. Dugenio knew of the warnings contained in the PDR and nevertheless ignored them, such "violation" was evidence to be considered by the jury in determining whether negligence had been established. The requested instruction read:
You may find that such violation constituted negligence on the part of a defendant, or you may find that it did not constitute such negligence. Your finding on this issue may be based on such violation alone, but in the event that there is other or additional evidence bearing upon that issue, you will consider such violation together with all such additional evidence in arriving at your ultimate decision as to defendant's negligence.
*120 The trial judge rejected the request, ruling that the PDR could not establish the medical standard of care in the case, and was relevant only to the question of whether Dr. Dugenio was on notice of the warnings contained therein.
Plaintiff now argues that had the jury been told that it could consider violations of the PDR as evidence of negligence by Dr. Dugenio, the jury may have found that "there was a preponderance of evidence that Dr. Dugenio deviated from the accepted medical standard of care in the treatment of plaintiff." In support of the argument plaintiff cites several out-of-state cases for the proposition that a warning is prima facie proof of a proper method of use of a drug. See Bowman v. Songer, 820 P.2d 1110, 1114 (Colo. 1991); Garvey, supra, 530 A.2d at 1145; Haught v. Maceluch, 681 F.2d 291, 303 (5th Cir.), reh. denied, 685 F.2d 1385 (5th Cir.1982).
No New Jersey case holds that a manufacturer's insert and the parallel PDR warning may be admitted into evidence to establish a medical standard of care. Three divergent approaches have evolved in the out-of-state cases. See Michael J. Farrell, Medication Practice: Claims, Culprits and Defenses, 16 Am. J. Trial Advoc. 65 (1992); see also David C. Minneman, Annotation, Medical Malpractice: Drug Manufacturer's Package Insert Recommendations as Evidence of Standard of Care, 82 A.L.R.4th 166, 185-90 (1990) and cases cited therein. The first approach is that product package inserts do not establish a standard of care but are admissible to show what the physician knew or should have known about the drug. See Reed v. Church, 175 Va. 284, 8 S.E.2d 285, 288 (1940). New Jersey adopted this approach in Sanzari v. Rosenfeld, 34 N.J. 128, 140, 167 A.2d 625 (1961).
The second approach is to allow product inserts (and the PDR) into evidence to show the standard of care, provided expert testimony is also presented to explain the standard of care to the jury. Salgo v. Leland Stanford, Jr. Univ. Board of Trustees, 154 Cal. App.2d 560, 317 P.2d 170, 180 (1957); Craft v. Peebles, 78 Hawai`i 287, 893 P.2d 138, 149 (1995); Grayson v. Oklahoma, 838 *121 P.2d 546, 548 (Okla. Ct. App. 1992); Ramon v. Farr, 770 P.2d 131, 135 (Utah 1989). In this category, some courts have held that the package insert is not conclusive evidence of the standard or accepted practice in the use of the drug by physicians, but "`it is prima facie proof of a proper method of use, given by the maker, which must be presumed qualified to give directions for its use and warnings of any danger inherent therein.'" Thompson v. Carter, 518 So.2d 609, 613 (Miss. 1987) (quoting Julien v. Barker, 75 Idaho 413, 272 P.2d 718, 724 (1954)). See also Garvey, supra, 530 A.2d at 1145; Nolan v. Dillon, 261 Md. 516, 276 A.2d 36, 48 (1971).
The third approach, the minority view, is that the product insert, standing alone without expert testimony, is evidence of negligence by the physician who fails to adhere to the warnings. See Mulder v. Parke Davis & Co., 288 Minn. 332, 181 N.W.2d 882, 887 (1970); Paul v. Boschenstein, 105 A.D.2d 248, 482 N.Y.S.2d 870, 871-72 (N.Y. App. Div. 1984). Some courts so hold if the package insert is "clear." Borka v. Emergency Physicians Prof. Ass'n, 379 N.W.2d 682, 684 (Minn.App. 1986); see also Ohligschlager v. Proctor Community Hosp., 55 Ill.2d 411, 303 N.E.2d 392, 396 (1973). Others suggest that the doctor has the burden "to justify his reasons for the deviation from such recommendation." Mueller v. Mueller, 88 S.D. 446, 221 N.W.2d 39, 42 (1974); Mulder, supra, 181 N.W.2d at 887 ("it is incumbent on the doctor to disclose his reasons for departing from the procedures recommended by the manufacturer").
All of the parties in this case agree that the trial judge properly admitted into evidence references to the PDR for purposes of establishing Dr. Dugenio's knowledge of the warnings contained therein. Dr. Dugenio admitted he was familiar with the warnings contained in the PDR, and learned of the necessary risk/benefit analysis to be made before prescribing the drug from the PDR's reference to such analysis for "Category C" drugs. Therefore, the PDR warnings were admitted to lay the foundation for the central issue in the case: whether Dr. Dugenio deviated from accepted *122 medical standards of care in administering Ciprofloxacin to plaintiff, despite the attendant, known risks to pregnant women. See Sanzari, supra, 34 N.J. at 140, 167 A.2d 625.
The trial judge properly rejected plaintiff's proposed jury instruction that "[y]ou may find that such violation [of the PDR] constituted negligence on the part of a defendant, or you may find that it did not constitute such negligence. Your finding on this issue may be based on such violation alone ...." (Emphasis added). This portion of plaintiff's request to charge essentially tracks the minority view, that a violation of the PDR constitutes prima facie evidence of negligence even without the production of expert testimony. We reject this approach because in the usual case, the standard of care in administering a drug is defined by medical community norms. As in any other medical malpractice case, such norms and standards must be established by expert testimony. See Rosenberg ex rel. Rosenberg v. Cahill, 99 N.J. 318, 325, 492 A.2d 371 (1985); Sanzari, supra, 34 N.J. at 135, 167 A.2d 625; Nowacki v. Community Med. Center, 279 N.J. Super. 276, 291, 652 A.2d 758 (App.Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995).
To have said to the jury that Dr. Dugenio's failure to follow the PDR warning "alone" may constitute negligence would have invited the jury to make a finding of malpractice without consideration of the prevailing standard of care established by the experts. Such a rule "almost forces a physician to follow the PDR directives or automatically suffer the consequences of a malpractice action." Farrell, supra, 16 Am. J. Trial Advoc. at 81. This approach also ignores the fact that:
[D]ifferences between the package insert and accepted medical practice represent the difference between the rigorous proof a regulatory agency must demand and the clinical judgment of a physician based on his training, experience, and skill as related to the needs of his individual patient. One cannot be taken as a standard for the other.
[Ramon, supra, 770 P.2d at 136 (quoting Peter H. Rheinstein, Drug Labeling as a Standard for Medical Care, 4 J. Legal Med. 22, 24 (1976)).]
*123 The proposed instruction not only stated that the jury may find negligence "based on such violation alone," but also stated that:
Your finding on this issue may be based on such violation alone, but in the event that there is other or additional evidence bearing upon that issue, you will consider such violation together with all such additional evidence in arriving at your ultimate decision as to each defendant's negligence.
Essentially, plaintiff now argues that this instruction or a similar instruction should have been given to permit the jury to consider the PDR references, along with the expert testimony, to define the standard of care and to determine whether Dr. Dugenio committed malpractice by deviating from that standard.
We adopt the view of those courts which have held that package inserts and their parallel PDR references may be considered by the jury along with expert testimony to determine the appropriate standard of care. See Craft, supra, 893 P.2d at 149; Ramon, supra, 770 P.2d at 135. The package inserts, although not designed per se to establish a medical standard of care, can be given weight as "authoritative published compilation by a pharmaceutical manufacturer." Thompson, supra, 518 So.2d at 613. With expert testimony providing the requisite standard and explaining the purpose of the PDR warnings, the jury will not be left to speculate whether the physician's non-adherence to the warnings constitutes negligence per se. The testifying expert will also provide, as in this case, a definition of the terms used by the manufacturer, and explain the "limitations of the information presented" by the PDR, thereby aiding the jury in understanding the limited purpose of the evidence. James R. Bird, Package Inserts for Prescription Drugs as Evidence in Medical Malpractice Suits, 44 U. Chi. L.Rev. 398, 425 (1977).
In this case, the PDR was evidential not only to prove Dr. Dugenio's knowledge of the warnings, but to reinforce the standard of care as defined by plaintiff's experts. As we have noted, Dr. Dugenio admitted he learned from the PDR about the risks of giving Ciprofloxacin to pregnant women. He also learned of the risk/benefit analysis in administering Ciprofloxacin from reading the PDR. He acknowledged that the PDR was a "guideline for *124 physicians ... to make them very familiar with the things that may ... occur as a result of the experiments that they have done in animals to see if it could have possible implications on human beings." Dr. Dugenio also admitted relying on the information the drug manufacturer gave about Ciprofloxacin as contained in the PDR.
In addition, plaintiff's experts made several references to the PDR. Although rendering their opinions as to the standard of care based on prevailing norms in the medical community, both experts relied in part on the PDR warnings in formulating those opinions. Referring to the PDR, Dr. Clark testified, without objection, that "Cipro[floxacin] is not an appropriate drug, and the manufacturer's own warnings say Cipro[floxacin] should not be used in pregnant patients and children, in great big bold letters." Also, Dr. Smialowicz's risk/benefit analysis was entirely consistent with the risk/benefit analysis recommended by the PDR. Thus, the PDR was foundational evidence to support the experts' testimony that the prudent physician, after making the risk/benefit analysis, would not have administered Ciprofloxacin to plaintiff.
Our finding that the PDR had evidentiary value as to the standard of care is not contrary to our Supreme Court's holding in Sanzari. There, the Court held that the manufacturer's brochure accompanying Xylocaine was not evidence of the standard of care in a dental malpractice case. Sanzari, supra, 34 N.J. at 139, 167 A.2d 625. The pertinent warning in Sanzari was that Epinephrine constricts blood vessels and where such constrictions is contraindicated, Xylocaine with Epinephrine should not be administered. Ibid. The Court held that the brochure was not evidential as to the standard of care because the issue was whether the dentist was negligent in not taking a medical history and the brochure said nothing about taking a history from the patient. Id. at 139, 167 A.2d 625. The Court noted:
In light of the above, it is unnecessary for us to determine whether a manufacturer's brochure, alone or in conjunction with other evidence, is admissible as proof of the standard of care in the administration of a drug.
[Ibid. (emphasis added).]
*125 On the facts before us, however, we cannot say that the trial judge's failure to give the instruction constituted reversible error. We may uphold "even erroneous jury instructions when those instructions are incapable" of prejudicing the substantial right of a party. Fisch v. Bellshot, 135 N.J. 374, 392, 640 A.2d 801 (1994); Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth., 18 N.J. 294, 315, 113 A.2d 787 (1955). Our task in determining whether such substantial prejudice exists requires us to consider the jury charge as a whole. Graves v. Church & Dwight Co., Inc., 267 N.J. Super. 445, 464-65, 631 A.2d 1248 (App.Div.), certif. denied, 134 N.J. 566, 636 A.2d 523 (1993).
Here, the jury heard extensive testimony concerning the PDR and viewed "blow-ups" of the relevant sections showing the pertinent warnings. Both of plaintiff's experts were permitted to testify with respect to the significance of the PDR, and plaintiff's counsel cross-examined Dr. Dugenio extensively regarding the PDR warnings. The jury was instructed that it may consider the opinions of each expert presented during the trial, and give weight to those opinions "to which you deem it is appropriate, whether that be great or slight, or you may reject it. In examining each opinion, you may consider the reason given for it, if any." The judge reminded the jury that "the value or weight of the opinion of the expert is dependent upon and is no stronger than the facts upon which [the expert] bases that opinion." Importantly, the judge did not give a limiting instruction as to the jury's use of the PDR; the jury was not told that the PDR's admission into evidence was limited to the issue of Dr. Dugenio's knowledge of the warnings. We have little doubt that, in obedience to these instructions, the jury considered the PDR warnings, not only as to the issue of notice, but also as evidence of the standard of care.
In addition, the PDR merely embodied the warnings and risk/benefit analysis which were addressed extensively by all experts. Without question, the standard of care was presented here by competent medical opinion; the PDR was relevant, but *126 only to corroborate those opinions. Therefore, the absence of a specific instruction concerning the PDR and standard of care did not prejudice the substantial rights of plaintiff.

II
Over plaintiff's objection, the trial judge gave to the jury the Model Jury Charge "exercise of judgment" instruction which reads as follows:
If a [physician] has applied the required knowledge, skill and care in the diagnosis and treatment of a patient, he or she is not negligent merely because there was a bad result. Likewise, where, according to accepted medical standards or practice, the manner in which the diagnosis or treatment is conducted is a matter subject to the judgment of the [physician], the [physician] must be allowed to exercise his judgment.

The [physician] cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake. Where judgment must be exercised, the law does not require the doctor to have infallible judgment. Thus, a [physician] cannot be found negligent so long as he or she employs such judgment as is allowed by the accepted medical practice.
If, in the exercise of his judgment, a doctor selects one or two or more courses of action, each of which in the circumstances has substantial support as proper practice by the medical profession, the doctor cannot be found negligent if the chosen path produces a poor result.
On the other hand, a doctor who departs from the standard medical practice where no judgment is permitted, ... cannot be excused, ... nor can he excuse himself from the consequences by saying that it was an exercise of his judgment. Or, to state it in a different way, if the exercise of a doctor's judgment causes him to do that which the standard medical practice forbids, the doctor would be negligent.
Similarly, a doctor whose judgment causes him or her to omit doing something which is required by the standard medical practice, he is also negligent.
[Emphasis added.]
Plaintiff argues that she was deprived of a fair trial because this "exercise of medical judgment" charge is "fundamentally confusing, a misstatement of the law and entirely unnecessary," and has the clear capacity to lead "a jury to conclude that a doctor, though negligent, is not liable where he exercises judgment."
We are constrained to reject plaintiff's argument because, broadly viewed, the charge follows the holding by our Supreme *127 Court in Schueler v. Strelinger, 43 N.J. 330, 344-45, 204 A.2d 577 (1964):
So, if the doctor has brought the requisite degree of care and skill to his patient, he is not liable simply because of failure to cure or for bad results that may follow. Nor in such case is he liable for an honest mistake in diagnosis or in judgment as to the course of treatment taken. A physician must be allowed a wide range in the reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that judgment does not represent a departure from the requirements of accepted medical practice, or does not result in failure to do something accepted medical practice obligates him to do, or in the doing of something he should not do measured by the standard above stated.
[Emphasis added.]
Nevertheless, we cannot pass the issue without expressing our dissatisfaction with the Model Jury Charge.
The most powerful sentence in the charge is as follows: "[t]he [physician] cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake." Without some reference to the relevant standard of care, this sentence alone is simply not the law. A physician exercises "judgment" every time he treats a patient. We sense a danger that the sentence is a signal to the untrained juror that an honest, good-faith exercise of judgment alone insulates the physician from liability.
We recognize that the sentence cannot be considered in isolation and must be understood in the context of the entire "exercise of judgment" instruction. For example, we are not unmindful that later in the charge it is explained that, "[i]f, in the exercise of his judgment, a physician selects one or two courses of action, each of which ... has substantial support as proper practice by the medical profession, the doctor cannot be found negligent...." This portion of the charge, as do the remaining paragraphs, obliquely makes reference to the pertinent medical standard of care against which the physician's "judgment" must be measured.
Nevertheless, we cannot help but note that the term "exercise of judgment" in one form or another is used eleven times during the instruction. Repetitive use of the term has, in our view, a clear capacity to muddle the jury's understanding of the central question; in the specific circumstances before the physician, *128 did he or she exercise the same degree of skill and diligence ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his or her field. Germann v. Matriss, 55 N.J. 193, 208, 260 A.2d 825 (1970).
Indeed, a growing number of courts have rejected similar "exercise of judgment" instructions because they "confuse jurors into focusing on the health care provider's subjective intentions and judgments rather than the real issue of whether the health care provider's conduct conformed to an objective standard of care." Parodi v. Washoe Med. Center, 111 Nev. 365, 892 P.2d 588, 590 (1995) (emphasis added); see also Jefferson v. Roberson, 626 So.2d 1243, 1246 (Ala. 1993); Krattenstein v. Thomas, 7 Conn. App. 604, 509 A.2d 1077, 1079, certif. denied, 201 Conn. 807, 515 A.2d 378 (1986); Riggins v. Mauriello, 603 A.2d 827, 831 (Del. 1992); Day v. Morrison, 657 So.2d 808, 812 (Miss. 1995); Yeager v. Riverside Methodist Hosp., 24 Ohio App.3d 54, 493 N.E.2d 559, 561 (1985); DiFranco v. Klein, 657 A.2d 145, 148 (R.I. 1995); Rooney v. Medical Center of Vermont, Inc., 162 Vt. 513, 649 A.2d 756, 760 (1994). In some jurisdictions the "professional judgment" rule is applied only in "those rare situations where the standard of care cannot be determined"; when the standard is well-defined, the "professional judgment" rule simply does not apply. Kurzner v. Sanders, 89 Ohio App.3d 674, 627 N.E.2d 564, 567 (1993), reh. denied, 68 Ohio St.3d 1448, 626 N.E.2d 689 (1994).
The central theme of all of the out-of-state cases is that, by focusing on the subjective intentions of the physician, the charge obscures the focal point in malpractice cases, that defendant must exercise the degree of care, skill and diligence required by law.
We endorse the view that "[w]hat is expected from a physician is much more clear when viewed in traditional negligence language." Day, supra, 657 So.2d at 814. When a physician chooses a treatment, did he or she exercise the same degree of skill commonly possessed and exercised by physicians in his or her field? The physician is not negligent in choosing a treatment, albeit unsuccessful, "so long as the treatment chosen was [appropriate] *129 based on the information then available to a reasonably prudent doctor in like circumstances." DiFranco, supra, 657 A.2d at 148. In other words, the message that must be conveyed to the jury is that the appropriate choices are those that a reasonable doctor would have considered under the same or similar circumstances. Rooney, supra, 649 A.2d at 760. In short, what is demanded is not good-faith exercise of judgment, but the exercise of due care. In our view, the Model Jury Charge does not convey that message in a clear manner.
However, as stated, we decline to reverse because of the Model Jury Charge's general adherence to Schueler. Moreover, we cannot say that any shortcomings in the charge given here had the capacity to cause substantial prejudice to plaintiff. There was compelling evidence that, under the circumstances presented to him, Dr. Dugenio conformed to prevailing medical standards by carefully weighing the risks in the use of Ciprofloxacin against its benefits. In deciding to administer the drug, he noted that all of the possible risks to the fetus related to potential lameness or cartilage damage as evidenced by tests performed on animals. His experts testified that he was properly concerned that plaintiff was suffering from a serious bacterial infection. He rejected the use of amoxicillin because plaintiff had been treated with that drug two weeks earlier with no success. Suspecting a hemophilus influenzae bacteria, he feared that the infection put plaintiff and her fetus at risk.
Defendant's experts also applied the risk/benefit analysis, noting that Dr. Dugenio was faced with some risk of giving Ciprofloxacin to a pregnant woman, as opposed to the substantial risk to plaintiff and the fetus in not administering the drug. The experts also noted that the risk of an anaphylactic shock existed with the administration of many other antibiotics, including amoxicillin. On this evidence we are confident that the jury focused on Dr. Dugenio's conduct in concluding that he adhered to the applicable medical standard of care in the circumstances.

*130 III
Plaintiff, in its Request No. 3, asked the trial judge to instruct the jury that "[t]he testimony of a single witness may be sufficient to convince you, by a preponderance of the evidence, of an essential element of the claim, or of a defense, if you believe that the witness has truthfully and accurately related what in fact occurred." Plaintiff argues that this instruction is essential because, in certain instances, she relied on the uncorroborated testimony of witnesses to establish certain facts. Plaintiff fears that without an explicit instruction, the jury might have been unaware that it could accept this uncontradicted but uncorroborated testimony.
The actual charge regarding this issue given by the trial judge reads in pertinent part:
A preponderance of the evidence means that the testimony presented on one's behalf must outweigh in your mind the testimony produced on behalf of the other party. The burden of proof is sustained when the person proves by the greater quality of the evidence that what they say outweighs that what is said by the other side.
Remember, it's not the number of witnesses that is presented, but rather it's the quality of that testimony that should be considered by you in determining whether or not the plaintiff has met her burden.
A party is not entitled to a jury charge in his or her own words. Gaido v. Weiser, 227 N.J. Super. 175, 199-200, 545 A.2d 1350 (App.Div. 1988), aff'd, 115 N.J. 310, 558 A.2d 845 (1989). While plaintiff's requested language may in fact have properly reflected the law, the instruction given by the trial judge addressed plaintiff's concerns in substance, if not in form. The judge emphasized to the jury that it was to consider the quality, and not the quantity, of the evidence presented. He further instructed that the jury must consider all credible evidence, and could either accept or reject all or part of a witness's testimony. These instructions were sufficient so as to instill an understanding in the jury that it could accept the testimony of one witness as conclusive if it believed such testimony. Because the charge requested by plaintiff was, in substance, given by the trial judge, *131 there is no reversible error. Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 384-85, 149 A.2d 193 (1959).
Affirmed.
NOTES
[1] The PDR is an annual publication compiling product information about pharmaceuticals. The information is provided by the drug manufacturers and is approved by the Food and Drug Administration. Each year the PDR and its supplements are sent free of charge to licensed physicians in the United States and abroad. A typical entry includes the trade name and chemical name of the drug, a description of the drug, indications and contraindications for its use, warnings, adverse reactions, administration and dosage, and information on managing and adjusting the dosage of the drug. Garvey v. O'Donoghue, 530 A.2d 1141, 1144 n. 4 (D.C. 1987). For purposes of this opinion, we do not distinguish between manufacturers' brochures, package inserts and PDR excerpts.