693 A.2d 1287

SYLVIA KIMMEL, EXECUTRIX OF THE ESTATE OF ELIAS M. KIMMEL, O.D., F.A.A.O., DECEASED, PLAINTIFF/APPELLANT, v. PEDRO DAYRIT, M.D., JOHN DOE, M.D. # 1–6, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 8, 1996—Decided June 5, 1997.

Stern, J., concurred and filed opinion.

Humphreys, J., concurred and filed opinion.

———

Before STERN, HUMPHREYS and WECKER, JJ.

*Daniel A. Zehner* argued the cause for appellant.

*Marie J. McCormack* argued the cause for respondent (*Dughi and Hewit*, attorneys; *Christopher J. Christie* and *Gary L. Riveles* on the brief).

The opinion of the court was delivered by

WECKER, J.S.C. (temporarily assigned).

Plaintiff Sylvia Kimmel, as executrix of the estate of her late husband, Elias M. Kimmel, appeals from a judgment dismissing her wrongful death and survival action and denying a new trial after a jury found no negligence in this medical malpractice action. Plaintiff's arguments, both on the new trial motion and on appeal, though somewhat inartfully presented, rely on the contention that the jury verdict represented a "miscarriage of justice." Plaintiff contends that "[t]here is a pervading sense of 'wrongness' surrounding the jury verdict...." Because the verdict was against the weight of the evidence, we reverse. *R.* 2:10–1. Our reasons, however, differ somewhat from plaintiff's contentions.

Plaintiff alleges negligence in Dr. Pedro Dayrit's failure on two separate occasions to obtain the results of a blood test, the carcino-embryonic antigen ("CEA") test, and his failure to order the CEA test on a regular basis after decedent's diagnosis and surgical treatment for colon cancer. Plaintiff argues on appeal that the verdict was inconsistent with the evidence and must have been the product of prejudice, mistake or confusion; that the trial judge erred in allowing the defense to cross-examine plaintiff's expert and to offer its own expert's testimony with respect to an article published years after defendant's care and treatment of plaintiff's decedent; and that the trial judge erred in allowing a defense expert to testify that his opinion was supported by scientific literature generally, without naming specific authorities.

On plaintiff's new trial motion, the trial judge correctly noted that the jury was presented with conflicting expert testimony on the standard of care with respect to regular CEA testing. The judge concluded that the jury had a full opportunity to weigh the expert testimony, and:

[they] could find either way and they did make a finding on that question. And it was that he was not negligent in that standard of care. And I find that there is no evidence that they failed in their obligations when they answered that interrogatory question. . . . And, therefore, I am going to deny the motion for a new trial.

The judge did not address the inconsistency between the verdict of no negligence and defendant's undisputed failure on two occasions to obtain the results of the CEA tests that he ordered, first in January 1984 and again in April 1989. The 1989 test would have revealed a metastasis that Dr. Kimmel learned about four months later, just two months before his death from metastatic disease. Defendant as well as his expert witnesses admitted his mistake with respect to the April 1989 test. As we said in *Eyoma v. Falco*, 247 *N.J.Super.* 435, 444, 589 *A.2d* 653 (App.Div.1991):

> To decide if a miscarriage of justice has occurred, we give deference to the trial court with respect to factors that are not apparent in the record on appeal such as the credibility and demeanor of witnesses. Beyond those considerations, *a reviewing court may independently scrutinize the record in order to determine whether the result was just.* See *Carrino v. Novotny,* 78 *N.J.* 355, 360–61, 396 *A.2d* 561 (1979); *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 597–98, 379 *A.2d* 225 (1977); *R.* 2:10–1. (emphasis added).

We have scrutinized the record and conclude the result was not just.

The material facts with respect to the decedent's medical history are not in dispute. Dr. Kimmel, an optometrist, had a family history of colon cancer, his mother having died of that disease. In 1979 he had rectal bleeding and underwent a sigmoidoscopy and barium enema. The results of both were normal. The bleeding was attributed to hemorrhoids. A sigmoidoscopy was repeated with normal results in 1981 and 1983. However, as a result of a shadow appearing on a barium enema in 1983, Dr. Kimmel was referred to Dr. Dayrit, a gastroenterologist, for colonoscopy, in which a longer flexible instrument allows visualization of the entire colon. During the colonoscopy on January 9, 1984, Dr. Dayrit discovered and removed a polyp. His written report of the procedure indicates that the polyp was growing along the wall of the colon rather than on a stalk and appeared to be cancerous. The tissue report of the laboratory examination indicated "adenocarcinoma intermediate grade . . . there is invasion beyond the

muscularis interna ... there are no segments of deeper muscle wall noted" in the specimen. It appeared that all of the cancer had been removed, and scans and x-rays performed at the time showed no sign that the cancer had spread.

Because of the nature and depth of the polyp, Dr. Dayrit referred Dr. Kimmel to a surgeon who performed a partial anterior resection of the sigmoid colon on January 13, 1984 to remove that section of colon where the polyp had grown. Dr. Dayrit had ordered a CEA test, as the standard of care required, and blood was drawn for that test on January 10. The results of the January 10 CEA test apparently were never received, and the test was not repeated for six months. Experts for both sides agreed that the standard of care required a CEA blood test within seven days of the surgical removal of the cancerous polyp and that a physician normally has a duty to obtain the results of a test he orders. One of plaintiff's claims is that Dr. Dayrit was negligent in failing to follow up the January 10 test either by promptly obtaining the results or by redoing the test. As a result, plaintiff claims Dr. Kimmel lost the opportunity to have a CEA test result within seven days of the tumor's removal.

The purpose of the seven-day CEA test is to learn whether the patient's cancer is of the type that produces the antigen which can be a marker for a recurrence or a spread of colon cancer. The seven-day period relates to the half-life of the antigen. If the CEA level is elevated within seven days before or after surgical removal of the cancer, and a later test is normal, then any subsequent test showing an elevated CEA level could be a sign of recurrence or spread. If the original colon cancer does not produce the marker antigen, subsequent CEA testing is ineffective for detecting a spread of that cancer.

Dr. Kimmel continued under the care of Dr. Dayrit after the surgery. On July 2, 1984 Dr. Dayrit again ordered a CEA test and performed a total colonoscopy. The results of both the blood test and the colonoscopy were normal. Dr. Dayrit performed colonoscopies on Dr. Kimmel in January 1985, January 1986, April

1987 and May 1988. A non-cancerous polyp was removed during the 1987 procedure. Otherwise no abnormalities appeared. Between July 1984 and April 1989 Dr. Dayrit never ordered CEA testing or liver function studies. Plaintiff's allegations at trial included the contention that the failure to order regular, periodic CEA testing was a violation of the requisite standard of care.[1]

After the negative colonoscopy in May 1988, Dr. Dayrit recommended a repeat examination in two years, which would have been May 1990. However, in April 1989 Dr. Kimmel developed abdominal symptoms and Dr. Dayrit admitted him to the hospital, suspecting either a peptic ulcer or gallbladder disease. Dr. Kimmel had previously suffered from gallbladder disease. For the first time since July 1984, Dr. Dayrit then ordered a CEA test. However, once again he never received or requested the results. When Dr. Kimmel's symptoms worsened in August, he learned for the first time, from another doctor, that the April 1989 CEA test revealed a highly-elevated antigen level of 1,595, which all expert witnesses agreed was an indication of serious metastatic disease.[2] In August a repeat CEA test showed an extremely high 7,000.

By September it was obvious that Dr. Kimmel had metastatic liver disease that had spread from the colon. It is undisputed that the most likely area for metastasis of colon cancer is to the liver. Each of the expert witnesses agreed that the cancer must have spread to the liver before the polyp was removed in January 1984, even though it was not detectable at the time. The spread remained dormant for most of the time between 1984 and 1989;

---

[1] Although counsel for plaintiff argued in summation that defendant was negligent in failing to order regular liver function studies as well as CEA tests, plaintiff's expert addressed the standard of care with respect to liver function studies only as a complement to CEA testing, and we therefore do not address that aspect of plaintiff's claim separately.

[2] There was no dispute among the experts that a normal CEA level is no more than five and false positive results do not normally exceed ten.

however, once it began to grow it became a fast-growing tumor.[3] By August 1989 it had spread throughout the liver, was not amenable to surgery, and despite chemotherapy in September, Dr. Kimmel died of metastatic liver disease in October 1989.

Plaintiff's expert oncologist, Dr. Gerald Sokol, testified that three omissions constituted deviations from the accepted standard of care, and that separately and together they reduced Dr. Kimmel's chances for a better outcome. Chronologically, the first claimed deviation was defendant's failure to obtain the results of the January 10, 1984 CEA test or to repeat the test within seven days after the cancerous polyp was removed. The next alleged deviation was defendant's failure after the colon resection to do regular CEA testing at intervals ranging between six weeks and six months. Finally, plaintiff's expert opined that defendant was negligent in failing ever to obtain the results of the April 1989 CEA test, which only became known four months later.

Defendant's expert witnesses disputed the first two allegations. They admitted, however, as did the defendant himself, that it was a mistake not to seek the results of the 1989 CEA test, but testified that knowing the results and the liver metastasis four months sooner would have made no difference to the outcome for Dr. Kimmel. Plaintiff argues that even if earlier diagnosis would not have extended Dr. Kimmel's life, it probably would have allowed more effective palliation and certainly would have given him the opportunity to plan his remaining time. Plaintiff testified to the circumstances of her husband's final two months of life and their inability to attend to the sale of his practice during that time. Plaintiff also adduced testimony from a business consultant that if Dr. Kimmel had had the additional time to plan, it would have allowed him to market his optometry practice more favorably. The jury could have found from the evidence that the sale of the

---

[3] We reject plaintiff's argument that the defense experts intentionally misled the jury by descriptions of the cancer variously as slow and fast-growing.

practice after Dr. Kimmel's death brought less than its appraised value before his death.

The verdict sheet that was given to the jury requested a "yes" or "no" answer to the first four of the following interrogatories[4]:

1. Did defendant Dr. Pedro Dayrit deviate from accepted standards of medical practice in his care and treatment of the late Elias M. Kimmel, O.D.?

2. Did defendant Dr. Pedro Dayrit's deviation increase the risk of harm posed by Dr. Kimmel's pre-existing condition by causing him to lose a chance of being cured and/or a chance of an improved quality of life for a period beyond that which he experienced?

3. Was the increased risk a substantial factor in bringing about the premature death of Dr. Kimmel?

4. Was the increased risk a substantial factor in causing the late Dr. Kimmel to lose a chance of an improved quality of life for a period beyond that which he experienced?

5. What amount of money will fairly and reasonably compensate plaintiff in this case?

The jury was instructed to go no further if the answer to either interrogatory 1 or 2 was "no," and to proceed to the final question only if it answered "yes" to question 3 or 4. The jury answered "No" to the first question, apparently rejecting all three of plaintiff's allegations of negligence and concluding that Dr. Dayrit did not deviate from the appropriate standard of care in any respect. Having found no negligence, the jury did not reach the proximate cause questions posed under *Evers v. Dollinger*, 95 *N.J.* 399, 416–17, 471 *A.*2d 405 (1984),[5] or the damages question.

■ We have reviewed plaintiff's contention that the verdict reflects a miscarriage of justice in light of the testimony of the several expert witnesses. Experts on both sides agreed that the standard of care required a seven-day CEA blood test that would

---

[4] On retrial, the jury interrogatories must be redrafted consistent with this opinion and the actual evidence adduced.

[5] Counsel agreed that because the alleged malpractice predated *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.*2d 398 (1990) and Model Jury Charge 5.36E, the apportionment required prospectively by *Scafidi*, *id.* at 114, 574 *A.*2d 398, did not apply to this case.

reveal whether the patient's cancer was one that produced an identifiable antigen marker. Defendant's expert gastroenterologist agreed that a physician who orders a particular test has a duty to obtain the result. In light of the seven day half-life of the antigen, the undisputed importance of the test's timing, and a physician's duty to obtain the results of tests he ordered, Dr. Dayrit was required by the applicable standard of care either to obtain the results, or to repeat the test, within seven days of the polypectomy. Nevertheless, there was insufficient evidence at trial that the missing January 1984 test result itself was a proximate cause of harm to Dr. Kimmel, and we would not reverse on that ground alone.

With respect to Dr. Dayrit's failure to obtain the abnormal results of the CEA test he ordered in April 1989, and that Dr. Kimmel did not learn until August, the experts all agreed that Dr. Dayrit had a duty to obtain the test result within a reasonable time. Dr. Dayrit himself testified that it was a "mistake" for him not to notice that he did not have the test report. Referring to the mistake in his summation, defense counsel said:

> And, you're right. He forgot it. Everybody knows that. He forgot to get the test results and he forgot to pass them onto [sic] the family. That was a mistake. Dr. Dayrit admits it was a mistake. No one is going to deny it.

When the April test result was finally obtained in August by another doctor, it revealed a CEA level of 1,595, which is evidence of significant metastasis. The experts disagreed as to whether the delay made a difference, in that the cancer may well have metastasized too extensively even in April to permit surgical resection. However, the experts agreed that while chemotherapy is not a cure, it can shrink a tumor that responds, thereby palliating symptoms and improving the quality of the patient's remaining life. Dr. Creech testified that Dr. Kimmel did not respond to chemotherapy in September 1989, a month before he died, implying that he would not have responded even if treated earlier. Dr. Sokol testified that 40% of patients with metastatic liver disease

do respond to chemotherapy.[6]

The jury verdict of no negligence is contrary to the undisputed evidence that defendant's failure to obtain the CEA test result in 1989 was a deviation.

It is clearly erroneous for a jury to disregard uncontradicted testimony by the defendant himself on the issue of liability merely because of disbelief of plaintiffs' damage testimony. In such event a new trial is required.

[*Dolson v. Anastasia*, 55 *N.J.* 2, 12, 258 *A.*2d 706 (1969).]

In light of the credible though disputed testimony that the 1989 deviation proximately caused damage to Dr. Kimmel, both medically and financially, we find a miscarriage of justice in the jury's failure to reach the proximate cause questions.

There was contradictory testimony among the experts with respect to plaintiff's second allegation of negligence—Dr. Dayrit's failure to order regular, repeat CEA tests between July 1984 and April 1989. Plaintiff's expert, Dr. Sokol, testified that the failure to order regular CEA testing as well as liver function studies for Dr. Kimmel after removing the cancerous polyp was a deviation from the accepted standard of care. Dr. Sokol opined that because the April 1989 CEA test eventually came back with a CEA level of 1,595, and a normal CEA level for a person without colon cancer is less than five, a significant elevation probably would have appeared had the test been done one and one-half to two years earlier. An elevated CEA would have signaled a spread, and since the liver was the most likely site of spread, liver scans would have been ordered and would have confirmed the site. Although Dr. Sokol agreed that metastatic disease that spreads to the liver is likely to cause death irrespective of when it is detected and treated, it was his opinion that earlier discovery would have given Dr. Kimmel a 2% to 12% chance of a surgical cure. Failure to perform the CEA test between July 1984 and April 1989, in Dr. Sokol's view, deprived Dr. Kimmel of that chance. While Dr.

---

[6] Neither expert was asked and neither offered an opinion whether the tumor's failure to respond at the terminal stage was probative of the likelihood that it would have responded if treated earlier.

Sokol agreed that surgery would have been useless if the metastasis was too widespread, he testified that there nevertheless would have been a 40% to 60% chance of reducing the tumor size with chemotherapy, thereby improving the quality of Dr. Kimmel's remaining life. Defendant's experts disagreed as to the chance of cure, but agreed that a CEA test well before 1989 would have shown elevated antigen levels suggestive of spread to the liver.

Defendant's expert witnesses were Dr. Francis X. Keeley, a gastroenterologist, and Dr. Richard Creech, an oncologist. Both testified that whether to perform periodic CEA tests on a patient with Dr. Kimmel's medical history was within the permissible medical judgment of the treating physician, that there were good reasons not to order periodic CEA tests on a patient whose cancer appeared to have been entirely removed, and that Dr. Dayrit therefore did not deviate from the accepted standard of care by not ordering regular CEA testing during his post-operative care and treatment of Dr. Kimmel. Dr. Keeley himself, however, made it a "practice to follow patients like Dr. Kimmel with colon cancer surgery with regular CEA's—CEA testing if that initial testing is elevated." Dr. Keeley admitted that when he prepared his written reports concluding that failure to do repeat CEA testing for Dr. Kimmel was not a deviation, he was under the mistaken impression that the seven-day CEA test had been negative. Dr. Keeley's responses to cross-examination are instructive:

Q. —I'm—I'll read from your report, the first report, January 8th, 1983, the third sentence in the first paragraph. "At the time the tumor was resected in 1984, the CEA was negative." And the next sentence: "Dr. Dayrit had absolutely no reason to repeat a CEA in my judgment." Is that a correct statement? . . .

A. Yes.

Q. Now, would it—okay. Let me ask you this. If hypothetically speaking that CEA of January 10th, 1984, had been elevated, would that have provided important and useful information to Dr. Dayrit in the care and following of this patient if it had been elevated?

A. If it had been elevated then some cancers make CEA, some Cancers don't make CEA. Some people die with cancer of the liver from—and the CEA won't even budge. The point being that if you pick up a tumor that is a great CEA maker, and this little tumor makes a lot of CEA, then what that is telling you is that sometime in the future when this thing starts to come back, if it does, that it

may give you a clue early on that you are dealing—it might be an early warning sign that you are dealing with cancer.

. . . .

So that—yes, if that were elevated then that would tell me, well, this is a kind of tumor that yes, where the CEA might be useful because we know this tumor, despite its size, is generating CEA.

. . . .

. . . what it does is say that you may have a marker that you might be able to pick up—

. . . it might give you a warning that indeed there is a recurrence.

Q. Okay. And that would affect your judgment in terms of how to follow this patient?

A. Yes.

Dr. Keeley cited the frequency of false positive results and the likelihood of unnecessary "second look" surgery as reasons not to do regular CEA testing, opining that annual colonoscopy alone was appropriate follow-up care for colon cancer. He testified that there is little evidence that the cure rate for regularly tested patients is any better than for patients who are not tested until symptoms appear, and that there is no justification for the risk of false positive test results and the ensuing unnecessary surgeries. Another limitation of the CEA test in his view was that it does not show the site of a spread; however, he did not rebut Dr. Sokol's testimony that radiotropic, nuclear or CT scans would complement an elevated CEA to determine whether the liver was involved.

Dr. Keeley was permitted to describe a 1993 article reporting that although 80% of gastroenterologists surveyed prescribed repeat CEA tests for colon cancer patients, regular testing was unnecessary because the great majority of patients gained no real advantage over waiting for symptoms. Defendant's own expert thus established that a majority of specialists in defendant's field did repeat CEA testing for post-surgery colon cancer patients. He testified that in the 1980's there were responsible gastroenterologists who believed that regular follow-up CEA testing after colon cancer was not appropriate. He described the article's conclusion that for the majority of colon cancer patients, repeat CEA testing after surgery would serve only to bring about

premature knowledge of a fatal spread of the disease.  Dr. Keeley also testified that the risk of metastasis to a different organ, most often the liver, is higher than the risk of developing another cancerous lesion in the colon;  that the risk of metastasis to the liver is 5%;  and that dormant cancer cells in the liver, such as Dr. Kimmel apparently had, do not release the CEA antigen and therefore repeat testing during the dormant stage would not have revealed the spread of Dr. Kimmel's cancer.  None of the experts could say when the dormant cancer cells in the liver began to grow and spread further, or at what rate.

Dr. Creech, defendant's expert oncologist, explained his view that regular CEA testing was not required as follow-up to colon cancer surgery.  He testified, contrary to both Dr. Keeley and Dr. Sokol, that there was a greater risk of another cancerous polyp in the colon than a spread to another site.  Because it was his opinion that CEA testing is not very useful for discovering malignant polyps, and the risk of metastasis appeared low, Dr. Dayrit was justified in not doing periodic CEA testing.  Dr. Creech put the risk of a spread to a new site at 10% to 20%, and although he agreed that with hindsight it was certain that cancer cells actually had spread from Dr. Kimmel's colon to his liver before the 1984 surgery, there was no detectable sign of a spread at that time. He testified that the survival rate for metastatic disease of the liver, spread from a cancerous polyp, is only 5%. Dr. Creech's estimate of the risk of spread as of 1984 was based upon his impression that it was a "superficial" polyp with no sign of further involvement.[7]

Dr. Creech emphasized that there is little treatment for metastatic liver disease, that few cases of metastatic liver cancer are amenable to surgical resection, and that the liver scans in August

---

[7] The experts disagreed about the staging of the original cancer.  Plaintiff's expert gave the lesion a somewhat more advanced "Duke's" classification, and thus a higher risk of recurrence, than did the defense experts.  Both defense experts were uncertain about the staging.  The dispute centered around the tissue report finding "there is invasion beyond the muscularis interna."

1989 showed multiple areas of spread that would not have been resectable. In his view, the available therapies are no more effective in prolonging life when begun earlier. Nevertheless, Dr. Creech agreed that scans could locate a spread to the liver, and that treatment options would exist. In accordance with the standard of care in 1984 and Dr. Kimmel's history, Dr. Creech testified that it was appropriate to treat Dr. Kimmel as cured and therefore to follow him with regular, repeat colonoscopies without repeat CEA testing. He agreed with Dr. Sokol that CEA testing in 1987 or 1988 would have shown an elevated antigen level but insisted that the resulting information would not have affected the patient's chance of survival. His own report stated that "hepatic resection in patients with a few stable liver metastases can be curative, but only in patients who have slowly progressive disease."

Dr. Creech admitted that he himself did regular CEA testing—and did so in the 1980's—on his own colon cancer patients who have a high risk of recurrence outside the colon. However, he testified that as an oncologist, the patients he follows generally do not present as Dr. Kimmel did in 1984, and most of his patients have cancers that have spread into the lymph system, putting them in the "high risk" category and making them candidates for chemotherapy. In 1984 Dr. Creech would not have thought Dr. Kimmel had a high risk of spread, and Dr. Dayrit was justified in treating him accordingly.

It was Dr. Creech's opinion that a patient with an untreatable but dormant disease is better off not knowing it. With respect to Dr. Kimmel's history of seeking testing for colon cancer because of his family history, this witness distinguished the desire to know about treatable polyps from a desire to know about untreatable metastasis, telling the jury "[w]hether you find out early or late that you have metastatic disease that's going to cause you to die, you know, I don't think that that is important." Neither he nor Dr. Keeley recognized the patient's right to be informed and to choose whether to seek the information for purposes of personal,

business, or financial planning, irrespective of any medical benefit. While plaintiff's expert did not express a duty to make the patient aware of the availability of CEA testing, with all of its pros and cons, such a duty is certainly inferable from the undisputed testimony regarding CEA testing.

We conclude that it was logically inconsistent for the defense experts each to agree that the seven-day CEA test was part of the required standard of care under the circumstances presented, but that follow-up testing would serve no useful purpose and was therefore not required by the standard of care. If subsequent testing for the marker was useless, there would be no reason to perform the original test to identify the marker. Neither of defendant's experts explained why, if CEA testing was useless, he himself did CEA testing on patients with more advanced colon cancers than Dr. Kimmel appeared to have in 1984, or treated patients with metastatic disease if treatment was useless.

The net result of all of the expert testimony regarding repeat CEA testing was in large part the sort of credibility question that juries are properly charged with—selecting the professional standard of care against which to measure the defendant doctor's performance from among opposing opinions of the experts. Plaintiff's expert opined that the appropriate standard required defendant to prescribe regular CEA tests after the colon cancer surgery, whereas defendant's experts opined that it was a matter of medical judgment [8] whether or not to do such regular testing. With differing opinions among experts, we would not normally interfere with a jury's choice of the appropriate standard of care. However, defendant's experts offered a value judgment, not a medical judgment, by testifying that a patient has no need to know he has a terminal condition. By offering that testimony, defen-

---

[8] We have previously expressed concern in *Morlino v. Medical Center of Ocean Co.*, 295 *N.J.Super.* 113, 126–29, 684 *A.2d* 944 (App.Div.1996), *certif. granted*, 149 *N.J.* 34, 692 *A.2d* 47 (1997), and caution the judge on retrial that the Model Jury Charge "exercise of judgment" instruction has a dangerous potential for confusing the jury. *Id.* at 127, 684 *A.2d* 944.

dant opened the door to the real issue regarding regular CEA testing following surgery: the patient's right to be informed about the availability, the benefits, and the limitations of repeat CEA testing.

Dr. Dayrit did not offer that information to Dr. Kimmel. If Dr. Dayrit had explained CEA testing to Dr. Kimmel, with its pros and cons, but recommended against it for the reasons the defense experts gave, that recommendation would be an exercise of judgment, and no negligence could be inferred from such a recommendation. Negligence, however, can be inferred where Dr. Dayrit denied Dr. Kimmel the opportunity to make his own choice. Deciding for the patient rather than giving him the choice reflects the same paternalistic approach that the Supreme Court rejected in *Largey v. Rothman*, 110 *N.J.* 204, 540 *A.*2d 504 (1988) (adopting the "prudent patient" standard for informed consent). There the Court explained:

> Perhaps the strongest consideration that influences our decision in favor of the "prudent patient" standard lies in the notion that the physician's duty of disclosure "arises from phenomena apart from medical custom and practice": the patient's right of self-determination. [*Canterbury v. Spence*, 464 *F.*2d 772, 786–87 (D.C.Cir.), *cert. denied*, 409 *U.S.* 1064, 93 *S.Ct.* 560, 34 *L.Ed.*2d 518 (1972).] The foundation for the physician's duty to disclose in the first place is found in the idea that "it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie." *Id.* at 781. In contrast *the arguments for the "professional" standard smack of an anachronistic paternalism that is at odds with any strong conception of a patient's right of self-determination. Id.* at 781, 784, 789.
>
> [110 *N.J.* at 214, 540 *A.*2d 504 (emphasis added).]

Defendant in summation argued:

> What does the CEA test do for the person? The CEA test gives you advanced knowledge of a fatal disease that you can't do anything about. That's why doctors don't do it.
>
> . . . .
>
> If he gets metastatic disease of the liver, he's going to die. He can die horribly and miserably, as Dr. Creech told us, he can die quickly. That's really his option. *And, CEA testing isn't going to change that. The doctors may think they're doing something because they're going to treat them for a year. They're not going to do anything of any value to anybody.*
>
> [emphasis added.]

That argument ignores the patient's "right of self-determination," 110 *N.J.* at 214, 540 *A.*2d 504, as well as the value the patient may have placed on knowledge—specifically for financial planning as alleged here—or for personal planning. There may well be a dollar value that a reasonable jury would award on the survival action for decedent's lost opportunity to determine for himself how to spend his remaining time on this earth. *See* Model Jury Charge 6.11(F).

■■■ A physician such as defendant has a duty to provide the patient with information that would be material to a prudent patient before making a medical decision to undergo or to decline a treatment, a procedure or a test.[9] This is a corollary to the "prudent patient" standard of informed consent. *See Largey v. Rothman, supra,* 110 *N.J.* at 211–14, 540 *A.*2d 504. To hold otherwise would be inconsistent with "the prerogative of the patient ... to self-determination" that requires the physician to make adequate disclosure to insure that treatment choices are made with the fully-informed, knowing participation of the patient. *Ibid. See also Caputa v. Antiles,* 296 *N.J.Super.* 123, 133–35, 686 *A.*2d 356 (App.Div.1996); *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 550–52, 589 *A.*2d 1059 (App.Div.1991).

In *Caputa* we granted a new trial because we found the defendant urologist's failure to adequately disclose the availability of continued observation, as an alternative to surgery for removal of a kidney stone, to be a deviation from the standard of care as a matter of law. We said there:

Clearly, the defendant excluded observation from the treatment alternatives offered to plaintiff because he thought it was not as good an option. Replete throughout defendant's testimony is the theme that he made a judgment that

---

[9] We recognize that there are circumstances when a physician is requested by responsible family members, acting in a patient's best interest, not to disclose a diagnosis or other disturbing information to the patient. We do not suggest that acceding to such a request, in appropriate circumstances, represents a deviation from standard medical practice. In this case, however, there is no claim that such circumstances existed.

surgery was the best option for the plaintiff and, therefore, surgery was the only option that he informed plaintiff about. That the doctor "may have in passing hinted on the fact" that observation existed as an alternative does not, as a matter of law, " 'impart information [that] the patient has every right to expect,' as well as [fulfill the doctor's] duty of 'reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved.' " *Largey, supra,* 110 *N.J.* at 211, 540 *A.2d* 504 (quoting *Canterbury v. Spence, supra,* 464 *F.2d* at 782). Thus, the jury should have been instructed, that as to the initial procedure, plaintiff had established that defendant failed to offer the alternative treatment of observation without intervention and thereby breached his duty to obtain plaintiff's informed consent.

[*Id.* at 137, 686 *A.2d* 356.]

In *Battenfeld,* we granted a new trial on defendant's appeal because of an erroneous charge quantifying "substantial factor" in percentages. Nevertheless, there we rejected defendant's argument that "the trial court should not have instructed the jury on informed consent. . . . [because] the issue . . . was injected into the trial by the court." 247 *N.J.Super.* at 550, 589 *A.2d* 1059. The plaintiff in *Battenfeld* claimed injury because she checked herself out of the hospital prematurely and "against medical advice" but with defendant's tacit approval and without adequate disclosure of the risk involved. There we were "convinced that a doctor owes the duty to his patient to apprise him of the potential hazards of refusing the recommended treatment," *id.* at 552, 589 *A.2d* 1059, and emphasized that the patient's right to information is equally applicable whether treatment is accepted or declined.

The informed consent doctrine has generally been applied in cases in which the patient has undergone the treatment proposed by the physician. At issue here is the informational needs of a patient who declines the treatment recommended by the doctor. However, both situations involve the right of a person to control his own body, "a basic societal concept." *In re Conroy,* 98 *N.J.* 321, 346, 486 *A.2d* 1209 (1985). In its decisions concerning the right of the terminally ill to renounce life-sustaining treatment, *our Supreme Court has recognized the patient's right to give an "informed refusal" to medical treatment as the legal correlative of the right to give informed consent.*

[*Id.* at 551, 589 *A.2d* 1059 (emphasis added).]

■ Unfortunately, plaintiff here did not argue the case to the jury or to the trial court on the issue plainly supported by the evidence: whether defendant had a duty to inform Dr. Kimmel of the availability of repeat CEA testing, allowing him to choose

whether to pursue that course. Plaintiff's expert indirectly addressed the duty to inform when he related that every patient wants to know if a cancer has spread. Nevertheless, the duty to inform a patient of all reasonable options is a standard of care well within the understanding of a lay jury and requires no expert testimony. *See Jenoff v. Gleason,* 215 *N.J.Super.* 349, 357–58, 521 *A.*2d 1323 (App.Div.1987). We conclude that if presented with that question the jury could reasonably have found such a duty and a deviation in defendant's failure to inform Dr. Kimmel of the option of regular CEA testing. The jury had no opportunity to address that question.

In *Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 413–14, 678 *A.*2d 1060 (1996), comparing and contrasting claims based upon "inadequate or inaccurate" legal counselling with "objective and subjective standards of informed consent ... in the field of medical malpractice," the Supreme Court noted:

> [i]t is a battery if a physician operates without the patient's consent; it is negligence if the physician operates without the patient's informed consent.
>
> [*Id.* at 414, 678 *A.*2d 1060.]

The physician's failure to inform the patient about an available test may well be negligence. On retrial, plaintiff must have the opportunity for a jury to determine whether a prudent patient would have wanted full information about regular, repeat CEA testing in order to decide how to proceed after cancer surgery such as Dr. Kimmel had.

Because we conclude for the reasons previously stated that the verdict represents a miscarriage of justice requiring a new trial, we also conclude that justice requires that plaintiff have the opportunity to present the failure-to-inform argument on retrial. *See Lanzet v. Greenberg,* 126 *N.J.* 168, 188, 594 *A.*2d 1309 (1991)(granting plaintiff a new trial), where the Court held:

> What was missing, however, from this case was the correct theory of liability. It was incorrect to ask the jury whether all of the harm that befell the patient was attributable to the physician-defendants. The correct instruction, not sought by the parties, was one that would require the jury to determine whether the physicians' neglect increased the risk of harm to the patient and whether that

increased risk was a substantial factor in producing her injuries. *Evers v. Dollinger, supra,* 95 *N.J.* 399, 471 *A.*2d 405.

Whether defendant had a duty to disclose the availability of follow-up CEA testing to Dr. Kimmel should be determined by a jury under the "prudent patient" standard adopted in *Largey, supra,* 110 *N.J.* at 213, 540 *A.*2d 504, which applies equally well to the physician's alleged negligence in failing to adequately inform the patient before deciding not to test or treat.

We recognize the conflicting evidence as to whether Dr. Dayrit's negligence was a substantial factor in reducing Dr. Kimmel's chance for a better outcome. The defense experts opined that the standard of care did not require Dr. Dayrit to order repeat CEA tests to detect metastasis because earlier treatment is no more effective than later treatment in prolonging life. Defendant's position was essentially that even if he had done everything that plaintiff claimed he should have done—ordered repeat CEA tests and obtained prompt results of the January 1984 and April 1989 tests—it would not have improved Dr. Kimmel's chances for a better outcome. While it is generally believed that early detection of cancer increases the chances of survival and cure, and late detection increases the risk of spread and death, there was substantial credible testimony that the metastatic disease that tragically took the life of Dr. Kimmel could not have been cured or slowed by tests the defendant failed to do or test results he failed to obtain.

In *Largey,* 110 *N.J.* at 214–15, 540 *A.*2d 504, the Supreme Court adopted our holding in *Skripek v. Bergamo,* 200 *N.J.Super.* 620, 636–38, 491 *A.*2d 1336 (App.Div.), *certif. denied,* 102 *N.J.* 303, 508 *A.*2d 189 (1985), that the objective standard applies to proximate cause in informed consent cases. That standard is " 'what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance.' " *Id.* at 636–37, 491 *A.*2d 1336, quoting *Canterbury v. Spence, supra,* 464 *F.*2d at 790–91.

We cannot know how the jury would have answered appropriate proximate cause questions. We do know the jury should have reached at least the threshold proximate cause question. As we said in *Caputa v. Antiles, supra,* 296 *N.J.Super.* at 138–39, 686 *A.*2d 356,

> Regarding the trial judge's refusal to grant a new trial, it is axiomatic that such a ruling "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1. To determine if a miscarriage of justice occurred, an appellate court defers to the trial court in regards to the "intangibles" of the case, including credibility, demeanor, and the general feel of the case, but otherwise makes its own independent determination of whether a miscarriage of justice occurred.
>
> [citations omitted.]

We have made that determination. Plaintiff's decision not to move for a directed verdict under *R.* 4:40 does not affect the motion for a new trial as defendant contends. The new trial motion is governed by the more discretionary standard of *R.* 4:49–1. *See Lanzet v. Greenberg, supra,* 126 *N.J.* at 174, 594 *A.*2d 1309, citing *Dolson v. Anastasia,* 55 *N.J.* 2, 6–7, 258 *A.*2d 706 (1969).

Plaintiff's arguments on appeal include the contention that the trial judge erred by allowing evidence—through cross-examination of Dr. Sokol and direct examination of Drs. Keeley and Creech—regarding the results of a research study published in 1993 [10] that concluded that repeat CEA testing after resection for colon center is not a useful tool for detecting metastasis because early detection did not significantly improve the outcome of the disease for the patients studied. We recognize the logic of expert testimony that the appropriate standard of care does not require performance of a test whose results do not provide useful information. We are mindful that on the evidence here, as is often the case where professional negligence is alleged, the issues of negligence and proximate cause are closely related. *See, e.g., Ahn v. Kim,* 145 *N.J.* 423, 434–35, 678 *A.*2d 1073 (1996); *Conklin v. Hannoch*

---

[10] Charles G. Moertel, et al., "An Evaluation of the Carcinoembryonic Antigen (CEA) Test for Monitoring Patients with resected Colon Cancer," 270 *Journal of the American Medical Association* 943 (August 25, 1993).

*Weisman, supra,* 145 *N.J.* at 410, 678 *A.*2d 1060. *See also Tindal v. Smith,* 299 *N.J.Super.* 123, 137, 690 *A.*2d 674 (App.Div.1997). The relationship here between deviation and proximate cause has potential for jury confusion and must be carefully considered in weighing the admissibility of the article.

Prior to opening statements plaintiff sought an *in limine* ruling excluding all reference to that study on the dual grounds that it was not relevant to the standard of care during the 1984–89 period [11] and because the patients in the study had more advanced colon cancer than did Dr. Kimmel, the results were irrelevant to his condition. The trial judge declined to rule *in limine* on the ground that evidence adduced during the trial would lend context to the issue. However, the record reflects no further inquiry, hearing, or argument before Dr. Sokol was cross-examined and a defense expert testified about that article. The judge apparently relied upon defense counsel's express representation that he did not intend to argue that the study affected the standard of care for Dr. Dayrit. Despite his expressed intention to limit his use of the 1993 Moertel article to proximate cause, defense counsel argued in summation "[H]ow can it be malpractice not to do a test that medical articles and literature have said is of no help in helping people live longer?"

Plaintiff did not request and the judge did not give any limiting instruction with respect to the testimony about that study. Plaintiff contends that no limiting instruction would have been effective. Because we conclude that the case must be retried, we address plaintiff's claim of error to assist the court and counsel on retrial. The learned treatise exception to the hearsay rule under *N.J.R.E.* 803(c)(18) does not avoid exclusion "under *N.J.R.E.* 403 if the danger of prejudice outweighs its probative value." *Biunno, Current N.J. Rules of Evidence,* Comment to *N.J.R.E.* 803(c)(18),

---

[11] *See* Model Jury Charge 5.36(A), relating the applicable standard of care to "the state of scientific knowledge at the time [the defendant] attended to the [patient]."

*citing Jacober v. St. Peter's Medical Center,* 128 *N.J.* 475, 492–93, 608 *A.*2d 304 (1992). *See also Apicella v. McNeil Labs., Inc.,* 66 *F.R.D.* 78, 86–87 (E.D.N.Y.1975) (*in limine* application). We recognize the trial judge's discretion under *N.J.R.E.* 403. *See Dinter v. Sears, Roebuck and Co.,* 252 *N.J.Super.* 84, 92, 599 *A.*2d 528 (App.Div..1991). Nevertheless, the trial judge had an obligation to analyze the study under *N.J.R.E.* 403 and to determine whether its "probative value [was] substantially outweighed by the risk of ... undue prejudice...." On retrial, the judge should conduct a Rule 104(a) hearing to consider the admissibility of the Moertel article and if admissible, the appropriateness of a limiting instruction thereto. *See Ladner v. Mercedes–Benz of North America, Inc.,* 266 *N.J.Super.* 481, 493–94, 630 *A.*2d 308 (App.Div. 1993), *certif. denied,* 135 *N.J.* 302, 639 *A.*2d 301 (1994) (failure to give required limiting instruction required new trial); *Johansen v. Makita, U.S.A., Inc.,* 128 *N.J.* 86, 102, 607 *A.*2d 637 (1992) (failure to give instruction requires reversal and remand for new trial).

We are satisfied that plaintiff's remaining contentions are without merit and warrant little further discussion. *R.* 2:11–3(e)(1)(E). In light of our remand for a retrial, however, we add the following.

■ We reject plaintiff's contention that the judge erred in permitting a defense expert to testify based upon his general education, training, and reading of the medical literature, without specifying particular texts or articles. The factual and scientific bases for an expert's opinion are among the factors a jury is instructed to consider when it weighs the reliability and credibility of an expert witness. *See* Model Jury Charge 1.15. Plaintiff's own expert, Dr. Sokol, testified without objection that his opinions were based upon all of his reading. There was no error in overruling this objection.

■ Plaintiff's argument that a new trial should have been granted because the defense experts' trial testimony contradicted their deposition testimony is equally without merit and is not a reason for our ruling today. To the extent that there was inconsistency between deposition testimony and trial testimony,

plaintiff's counsel took every opportunity to cross-examine and to argue in summation with respect to such inconsistency. It is always within the province of the jury to consider such evidence in deciding how much to rely on any witness's testimony.

The judgment for defendant is vacated, the order denying a new trial is reversed, and the matter is remanded for a new trial consistent with this opinion.

STERN, J.A.D. (concurring).

I concur in Judge Wecker's opinion and agree that a physician must generally advise a patient of treatment alternatives in non-emergent circumstances. *See generally* John H. Derrick, Annotation, *Medical Malpractice: Liability for Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment*, 38 *A.L.R.4th* 900, 903–04 (1985). I write separately only to emphasize my agreement with respect to the principles governing our scope of review as expressed by Judge Humphreys and to state why I do not believe those principles apply in this case.

As our Supreme Court made clear in *Ford v. Reichert,* 23 *N.J.* 429, 435, 129 *A.*2d 439 (1957):

> If and when the Appellate Division concludes substantial justice requires the invoking of the plain error rule and the issues have not been presented or argued, the litigants are entitled to notice of the points the court thinks constitute plain error and have a right to be heard before a final determination. The court should not deprive the parties of their day in court or their right to be heard on matters which may defeat their cause.

Here, we reverse only because of an issue clearly raised on plaintiff's motion for new trial—that it "clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a). Plaintiff claimed before the trial judge and on appeal before us that the jury's finding of no negligence or "deviat[ion] from the accepted standards of medical practice" requires a new trial.

Judge Humphreys concludes that we should not decide what he calls the "informed consent" issue because that theory was not specifically pleaded in the complaint, was not raised by request or

objection addressed to the jury instructions, and was not asserted in plaintiff's brief before us as grounds for reversal.

Judge Wecker suggests that the "failure to inform" theory was an inherent part of plaintiff's case at trial and that even if not properly presented to the trial court, the issue must be addressed before retrial as a result of what was presented to us. I agree, particularly because the complaint alleged that defendant failed "to recommend a course of treatment of chemotherapy and other courses of treatment" for colon cancer which may have elongated plaintiff's life. And based on the proofs at trial plaintiff argued in summation that defendant was deprived of "treatment options" and that defendant "can't decide, well, for this patient, I'm not going to [test] because I don't want to know."

We do not reverse on the "failure to inform" issue. The reversal is based on the "miscarriage of justice" attributable to the finding of no malpractice. Had we not addressed the "failure to inform" issue plaintiff still could have moved to amend her complaint before the new trial which Judge Humphreys agrees must follow.

Judge Humphreys also concludes that the majority opinion might significantly expand New Jersey law. While I join Judge Wecker's opinion in permitting the "failure to inform" theory to be presented as part of plaintiff's case, the opinion does not require the trial judge to present it to the jury. The theory can be explored as any other issue in the adversary context at trial. Thus, even if Judge Wecker's opinion expands the doctrine of "informed consent," I have no hesitation in these circumstances to permit the issue to be developed at trial and thereafter explored by us on the record made. *See Baird v. American Medical Optics,* 301 *N.J.Super.* 7, 12–13, 693 *A.*2d 904 (App.Div.1997); *Shackil v. Lederle Labs.,* 219 *N.J.Super.* 601, 635, 530 *A.*2d 1287 (App.Div.1987) (Stern, J.A.D., concurring), *rev'd on other grounds,* 116 *N.J.* 155, 561 *A.*2d 511 (1989). *See also* Annot., *Malpractice–Alternative Diagnostic Modes, supra.*

HUMPHREYS, J.A.D., concurring.

I concur with my colleagues that the jury verdict for the defendant must be reversed and the case remanded for a new trial. Dr. Dayrit admittedly made a mistake when in 1989 he failed to obtain and review the CEA test report. His conduct cannot be squared with accepted medical practice. Further, the record would support a jury finding that his error caused Dr. Kimmel financial damage. *See* majority opinion at 356, 693 *A.*2d at 1299. Under these circumstances, the jury verdict of no deviation from accepted medical practice is a miscarriage of justice which must be reversed.

I do not agree with the majority's decision *sua sponte* that plaintiff has a valid cause of action based on an informed consent theory. This theory was not presented at trial, *see* majority opinion at 350, 693 *A.*2d at 1295, nor was it presented to or argued before us. Ordinarily, we should not create issues. Certainly we should not create and then decide them without first hearing from the parties. *See Ford v. Reichert,* 23 N.J. 429, 435, 129 A.2d 439 (1957) (the parties have a right to be heard before a final determination is made as to issues not presented or argued).

Further, I question whether such a theory of liability is applicable here. The doctrine of informed consent is generally applied when a patient is about to undergo an operation. *See Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 414, 678 *A.*2d 1060 (1996) ("... [T]he consent involved in medical malpractice usually relates to the invasion of a patient's body."). My colleagues apparently conclude that the informed consent doctrine should be extended to a physician who monitors a patient for the reappearance of cancer. They hold that as a matter of law a monitoring physician must inform patients about a test for cancer which some physicians consider useful even though the monitoring physician and other physicians may consider the test useless and harmful. Presumably, my colleagues conclude that the monitoring physician must obtain the patient's consent *not* to use the test. Failure to obtain the patient's consent not to use the test apparently renders the

physician liable under the doctrine of informed consent without the necessity of medical evidence as to the proper standard of medical care.

I am uncertain whether the doctrine of informed consent does or should reach that far. *See generally McGeshick v. Choucair,* 9 *F.*3d 1229, 1233 (7th Cir.1993) (a physician is not under a duty to inform the patient of all possible methods of diagnosis); *Reed v. Campagnolo,* 332 Md. 226, 630 A.2d 1145, 1152–54 (1993) (a cause of action under a theory of lack of informed consent does not arise from a physician's failure to inform a pregnant patient about the availability, risks and benefits of diagnostic testing which might reveal birth defects); *Parris v. Sands,* 21 *Cal.App.*4th 187, 25 *Cal.Rptr.*2d 800, 803 (1993) ("Generally, appellate courts have rejected a general duty of disclosure concerning a treatment or procedure a physician does not recommend.... [P]laintiffs [must proceed] ... under ordinary medical negligence."); *Vandi v. Permanente Medical Group, Inc.,* 7 *Cal.App.*4th 1064, 9 *Cal. Rptr.*2d 463, 467 (1992) (a physician is not liable under a lack of informed consent theory for failure to disclose a medical treatment or diagnostic procedure which the physician does not recommend; such a cause of action would place an "imprecise and unpredictable burden upon a physician"); *but see Moore v. Preventive Medicine Medical Group, Inc.,* 178 *Cal.App.*3d 728, 223 *Cal.Rptr.* 859, 863 (1986) (a physician is under a duty to disclose all material information which would allow a patient to make a decision on whether to see a specialist).

No physician in this case testified that any such disclosure requirement was accepted medical practice in the period from 1984 to 1989. Before such a far reaching judicial decision is made, the parties should be given an opportunity to brief and argue the matter. *See Ford v. Reichert, supra,* 23 *N.J.* at 435, 129 *A.*2d 439.

Further, the majority's newly spawned theory of liability should be considered in an appropriate factual context. A case such as this which is tried on one theory (a deviation from accepted medical standards) is not a good launching pad for the develop-

ment of a different and questionable theory of liability. This is especially true if the new theory may have far reaching consequences for the medical profession.

I also disagree with the majority's ruling *sua sponte* that plaintiff must be permitted to present this new liability theory at the retrial. *See* majority opinion at 357, 693 *A*.2d at 1299. Whether this new issue must be permitted at the retrial has not been presented to us nor argued. Consequently, fair and proper jurisprudence mandates that we not determine this question.

In any event, this new theory of liability, judicially conceived nearly six years after suit was filed, should be subject to appropriate motions at the trial level. *See Fisher v. Yates,* 270 *N.J.Super.* 458, 467, 637 *A*.2d 546 (App.Div.1994); *Du–Wel Products v. U.S. Fire Ins.,* 236 *N.J.Super.* 349, 364, 565 *A*.2d 1113 (App.Div.1989) (the trial court may refuse to permit "new claims and new parties to be added late in the litigation and at a point at which the rights of other parties will be prejudicially affected"), *certif. denied,* 121 *N.J.* 617, 583 *A*.2d 316 (1990).